**Patricia Ryan BERLICKIJ Plaintiff,**

v.

**THE TOWN OF CASTLETON, Defendant.**

**No. 2:00–CV–465.**

United States District Court, D. Vermont.

June 8, 2004.

James A. Dumont, Law Offices of James Dumont, Bristol. VT, for plaintiff.

Joseph A. Farnham, McNeil, Leddy & Sheahan, P.C., Burlington, VT, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, Chief Judge.

Plaintiff Patricia Ryan Berlickij, a former town zoning administrator and assessor for the Town of Castleton, Vermont, has sued the Town alleging violations of federal and state constitutions and statutes in connection with the termination of her employment. All claims for damages against the individual defendants were dismissed at summary judgment, as were Counts 2 and 8 of the Complaint. *Berlickij v. Town of Castleton*, 248 F.Supp.2d 335, 348 (D.Vt.2003). The request for rein-

statement and back pay in Count 7 was also dismissed. *Id.*

Berlickij's remaining claims are as following: the Town violated her First Amendment rights of association, to petition for redress of grievances, and to free speech by holding secret meetings (Count 1); the Town discharged her in retaliation for her exercise of free speech rights protected by the First Amendment and Article 13 of the Vermont Constitution (Counts 3 & 4); the Town retaliated against her in violation of both the Fair Housing Act, 42 U.S.C.A. § 3601–3631 (West 2003) and Vermont's Public Accommodations Law, Vt. Stat. Ann tit. 9, §§ 4500–4507 (Counts 5 & 6); and the Town violated her rights under Vermont's Open Meeting Law, Vt. Stat. Ann. tit. 1, §§ 310–314 (Count 7). She seeks compensatory and punitive damages as well as declaratory and injunctive relief. The case was tried to the Court on December 3–5, 2003 and January 8, 2004. The following are the Court's findings of fact and conclusions on law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I. *Findings of Fact*

### A. *Background*

The Town of Castleton is a municipality in Rutland County, Vermont. Patricia Ryan Berlickij is a resident of Rutland County. In 1988, Berlickij was appointed to the position of town Zoning Administrator. In Castleton, the Planning Commission recommends an individual for the position of Zoning Administrator to the Selectboard; the Selectboard makes the final appointment. The Zoning Administrator serves a three-year term. Berlickij's fourth and final three-year term began in March of 1997. In 1988, Berlickij also became the town Assessor, a position she held until 2000.

In 1995, the voters of Castleton rejected a ballot item to combine the positions of Town Manager and Zoning Administrator. Mins. of April 10, 1995 Town Mtg. at 17 (Pl.'s Ex. 13). In February of 1999, Castleton voters approved a ballot item that recommended the elimination of the assessor position by a vote of 367 to 272. Mins. of Feb. 27, Mar. 2, 1999 Town Mtg. & Election at 2 (Pl.'s Ex. 24). The voters also approved a $18,450 annual budget for listing. *Id.* at 3.

### B. *The Spectrum Controversy*

Spectrum Youth and Family Services, Inc. ("Spectrum") is a non-profit organization that provides a variety of social services for families and young people. In the summer of 1999, Spectrum intended to purchase a house at 511 Sand Hill Road in Castleton to use as a crisis stabilization home for young women.[1] The intended residents were young women, between the ages of twelve and eighteen, who were in the custody of the Department of Social and Rehabilitative Services because of abuse or neglect and who suffered from psychiatric disorders. Dec. 3, 2003 Tr. at 123–24. Spectrum was to operate the home as a secure facility with an expected capacity of between five to seven residents. Residents were to stay approximately ten days.

In July 1999, a representative of Spectrum contacted Berlickij about Spectrum's intended purchase of the Sand Hill property. Dec. 3, 2003 Tr. at 46, 126–27. A number of anonymous callers had told Spectrum employees that the organization could not move into the Sand Hill area without a zoning permit. *Id.* at 127. The

---

1. Spectrum had contracted with the State of Vermont's Department of Social and Rehabilitative Services to provide the home.

Spectrum representative asked Berlickij whether the proposed group home would be considered a single family under the Town zoning ordinances.[2] *Id.* at 47.

Berlickij's understanding was that the zoning ordinances governing single-family status "do not put a cap on number of people. They have to live in the house as a family, using the facilities—the same facilities, bathrooms kitchens, just sharing the house as a family." *Id.* at 47. She considered the situation to be analogous to the residential situation of Castleton's college students. *Id.* at 48.

In order to be certain, Berlickij consulted with Deborah Markowitz, the Secretary of State of Vermont, and Libby Turner, counsel for the Vermont League of Cities and Towns. *Id.* Berlickij understood Markowitz and Turner to confirm her assessment. *Id.* at 48. Berlickij also understood Markowitz and Turner to assert that, under the Federal Fair Housing Act, Castleton could not prevent Spectrum from using the Sand Hill property as a group home. *Id.* at 48–51.

Berlickij told the Spectrum representative that "we had no ordinance to stop them, and they were going to be considered single family, and they didn't need a permit because the house had been used as a single family and that's what they were going to be considered." *Id.* at 51. The Spectrum representative asked Berlickij for a letter. *Id.*

Berlickij complied; in her letter, she first addressed the interaction between Vermont law and the Fair Housing Act. "The provisions of Vermont law which govern the regulations of group homes have been pre-empted by the Federal Fair Housing Act which prohibits discrimination on the basis of handicap or status." Letter from Berlickij to Spectrum of July 19, 1999 (Pl.'s Ex. 28). Berlickij concluded with a statement specific to the Town of Castleton's zoning ordinances. "The Town of Castleton does not regulate group homes differently than single family homes." *Id.* The letter did not state that Spectrum does not need a zoning permit or does not need to apply for a zoning permit.

A group of Castleton citizens from the Sand Hill neighborhood attended a Castleton Selectboard meeting on August 9, 1999. Gary Shuhart, a Vermont state trooper, acted as a spokesperson for the group. Mins. of Aug. 9, 1999 Selectboard Mtg. at 7 (Pl.'s Ex. 29). Shuhart and the other Sand Hill residents were opposed to Spectrum moving into their neighborhood. They were particularly concerned that the young women would threaten the safety of the neighborhood. *Id.* at 7–10. A number of Sand Hill residents stated that they believed the zoning ordinances should protect their neighborhood from Spectrum. *Id.*

According to the minutes, Berlickij stated that she had checked with the Vermont League of Cities and Towns and that Spectrum could not be zoned out of the neighborhood. She also stated that Spectrum was considered a family and that there were no restrictions on a single family dwelling. Berlickij concluded that as far as she knew there was no way to restrict Spectrum from the residential neighborhood. *Id.* at 8.

Berlickij claims she also mentioned the Fair Housing Act to a smaller group of Sand Hill residents during a break in the meeting. Dec. 3, 2003 Tr. at 58. The

---

**2.** According to Berlickij, the Spectrum representative who first contacted her was either Suzanne Hinsdale or Terry McLaughlin. Dec. 3, 2003 Tr. at 46. Marti Backus, a Spectrum employee and the project leader for the Sand Hill home, testified that she was the Spectrum representative who contacted Berlickij about the Sand Hill property. *Id.* at 126.

minutes do not reflect any mention of the Fair Housing Act. Mins. of Aug. 9, 1999 Selectboard Mtg. at 7–10.

Terry McLaughlin, a Spectrum representative, also attended the meeting. *Id.* at 8. McLaughlin stated that she had contacted Berlickij "numerous times" and had been assured that there was no need for a permit. *Id.* at 9–10.

Selectboard Member Charles Brown moved for the Town to hire an attorney to research the zoning issues related to Spectrum. *Id.* at 8–9. There was no second to Brown's motion. *Id.* at 9. Selectboard Member Elizabeth Shepard expressed concern that hiring an attorney would set a negative precedent; in the future, every group of citizens with a problem in their neighborhood would request the Town pay for an attorney. She refused to second a motion to hire an attorney that lacked a dollar-limit. *Id.*

Selectboard Member William Doran compared the Spectrum situation to college students living in Castleton. Doran opined that Spectrum home was within the zoning regulations because it was considered a family. *Id.*

Brown subsequently moved to hire an attorney with a budget not exceeding $1,000. Shepard seconded and the Selectboard unanimously voted in favor. *Id.* at 10. The Town hired Attorney James Carroll to work on the Spectrum matter.

On August 11, 1999, Berlickij, Castleton's Town Manager Beverly Davidson, and Selectboard Chairman Patrick Eagan discussed the Spectrum matter in the Town Manager's office. Attorney Carroll participated in that conversation via conference call. Dec. 3, 2003 Tr. at 61; Dec. 4, 2003 Tr. at 19; Dec. 5, 2003 Tr. at 153–54; Jan. 8, 2004 Tr. at 36, 124–25.

That same day, Berlickij wrote a second letter to Spectrum concerning the Sand Hill property. Letter from Berlickij to Spectrum of Aug. 11, 1999 (Pl.'s Ex. 30). This second letter was prepared with the assistance of Attorney Carroll. Dec. 4, 2003 Tr. at 17. Carroll "advised" Berlickij to "clarify" the Town's position that no permit would be necessary, provided that there were no more than six residents who were developmentally or physically handicapped. Anything different would constitute a change in use and require a permit. Carroll Notes (Pl.'s Ex. 101).

In her second letter, Berlickij set forth the requirements that residential care homes must meet to qualify for single-family status under state law.

> According to 24 V.S.A. 4409(d) provides [sic] that a state or licensed residential care home serving not more than six persons who are developmentally disabled or physically handicapped, shall be considered by right to constitute a permitted single-family residential use of property except that no such home shall be so considered if it locates within 1,000 feet of another such home.

Letter from Berlickij to Spectrum of Aug. 11, 1999 (Pl.'s Ex. 30).

Berlickij continued, "[u]pon advice of counsel, we will need documentation on the status of the persons housed at this project." *Id.* She concluded, "[i]f these people do not fit the requirements of the above statute and the number of persons is increased, you will need an approved zoning permit, or be in violation of the Town's Zoning Ordinance." *Id.*

On September 15, 1999, Carroll sent a letter regarding the Sand Hill property to Attorney Kupferer, who was representing a group of Sand Hill residents, and Attorney Richard Bloomer, counsel for Spectrum. Carroll first addressed Berlickij's letters to Spectrum on July 19, 1999 and August 11, 1999. "Ms. [Berlickij] wrote these letters as a good faith effort at responding to Spectrum's request for infor-

mation, but they should not be taken or relied upon as a final determination, by either her or the Town of Castleton, as to the need for a zoning permit given Spectrum's anticipated use of the [Sand Hill] property." Letter from Carroll to Kupferer & Bloomer of Sept. 15, 1999, (Pl.'s Ex. 33).

Carroll pointed out that under 24 V.S.A. § 4442, "no specific authority exists, or is conferred upon, a zoning administrator to provide an advisory opinion outside the context of a formal permit application." *Id.* Carroll stated that there are a number of legal issues, "including those under the Fair Housing Act" that need to be addressed. *Id.* As a result, "[i]n order for Ms. [Berlickij]'s decision to be fully informed, it will be necessary to submit an application containing the minimum information necessary to address the issues raised in your letters." *Id.* Carroll finished:

> Under these circumstances, the Town is not, and will not, be in a position to provide a specific opinion as to whether Spectrum's anticipated use constitutes a "change in use" or "land development" unless and until Spectrum actually submits a permit application for consideration with sufficient facts and information to make the required determination. In this regard, it would be helpful to submit a copy of Spectrum's proposed placement contract with the State of Vermont. Whether Spectrum actually does so is, of course, entirely up to it but it should not, under any circumstances, read Ms. [Berlickij]'s previous correspondence as a binding ruling or determination by the zoning administrator. As expressed above, this may only be rendered in the context of a specific application.

*Id.*

Carroll sent Berlickij a copy of the letter for approval before he mailed it to Kupferer and Bloomer. Carroll Mem. at 1 (Def.'s Ex. GG); Jan. 8, 2004 Tr. at 114–15. Berlickij approved the letter and authorized its mailing. Carroll Mem. at 1.

Spectrum closed on the Sand Hill property on October 8, 1999. Prop. Trans. Tax Return (Pl.'s Ex. 70). Attorney Carroll sent another letter to Spectrum three days later. Carroll states that by purchasing the property Spectrum "assum[es] the risk that it can secure any necessary municipal permits for its anticipated use and renovations to the property." Letter from Carroll to Richard Bloomer at 1 (Pl.'s Ex. 115). Carroll "reiterate[d] that the appropriate course of action is for Spectrum to submit a permit application." *Id.*

On October 12, 1999, residents of the Sand Hill neighborhood again attended a Selectboard Meeting to discuss the Spectrum issue. Attorney Carroll explained that Spectrum had asked the zoning administrator for an advisory opinion but had yet to file a permit application. Mins. of Oct. 12, 1999 Selectboard Mtg. at 4 (Pl.'s Ex. 34). He explained that a letter had been written to Spectrum requesting that Spectrum file a permit application. *Id.* Carroll further stated that he had advised that until Spectrum filed an application, "the Town is not in a position to make a response for or against the use and whether there is a need for a permit." *Id.* According to Carroll, the Town "did not have all of the information needed to make the decision." *Id.* Carroll repeatedly warned that the Town faced liability if it took action in opposition to Spectrum before gathering sufficient information. *Id.* at 5, 7.

Attorney Carroll specifically addressed the Fair Housing Act at a number of points during the meeting. For example, he stated that "[i]f the residents are covered under the Fair Housing Act then the State or Town regulations are pre-empted

by Federal law." He warned that "[i]f the Town of Castleton takes action and they have not done all the research they needed or do not have all the information needed, then they are exposing themselves to liability by going against Federal law." *Id.* at 5. Carroll later stated that he believed "that the zoning coincides with the Fair Housing Act. By the State statute [Spectrum] may be in violation of the Fair Housing Act with there being a limit of 6 people." *Id.* at 6.

Attorney Kupferer asserted that the Town of Castleton "needs to demand that [Spectrum] submit an application and that no one is to move into the property until the zoning issues are taken care of." *Id.* He argued that it should not be to the detriment of the Sand Hill residents if Spectrum did not file for a permit application. *Id.* Kupferer cautioned that the Town "should be careful not to drop the ball on the action that needs to be taken. They have done well up until now, and they should base their actions on the information that they have now." *Id.* He later accused the Town of "being the nice guy to these people" and "taking a sit-back-and-wait-and-see approach." *Id.* at 5. He suggested that a "stronger letter from the Town attorney was in order." *Id.* at 7.

Several members of the Selectboard spoke on the issue. Selectboard Member Brown stated that in the beginning Berlickij had indicated that Spectrum did not need a permit. Berlickij explained that "when [Spectrum] asked she was told there would be six residents that would have been true, but now it is up to eight or ten residents." *Id.* at 5. At a later point in the meeting Brown stated that because "they already know that there are going to be eight or more residents" he believed "the Town should tell them they need a permit." *Id.* at 6. He also stated that gathering information should be "top priority" for Berlickij and Carroll because the

Sand Hill residents needed to "rest easy" that "something is being done" and he didn't feel that "they are getting any answers at this point." *Id.* at 7. Brown questioned why Castleton could not legally send the Town listers to inspect the Sand Hill property. *Id.* at 6.

Selectboard Chairman Patrick Eagan opined that Spectrum was "trying to come in the back door by ignoring the letter from Attorney Carroll and not making any effort to file an application or to determine for certain if the use needs be permitted." *Id.* at 5.

Selectboard Member Shepard stated that "the noise and traffic issue was something they could go on and whether that was something that should be considered as a violation of zoning." *Id.* at 7. She was also in favor of another letter from the Town to Spectrum. *Id.* at 8.

Aside from her statement to Selectboard Member Brown, Berlickij's only comment was in response to a citizen who questioned if there was a way to stop Spectrum from making alterations in the Sand Hill property. *Id.* at 6. Berlickij explained that Spectrum "can only be stopped if they are making the footprint of the building larger or if they are going up with the building." *Id.*

Attorney Carroll testified that "just about everybody in town," including Berlickij, was unhappy with the idea of an entity coming into town and changing the use of a piece of property without applying for a permit. Jan. 8, 2004 Tr. at 129.

At a subsequent Selectboard meeting, the Board discussed Attorney Carroll's fees for his work on the Spectrum issue. Selectboard Member Brown stated that "he did not understand how once again someone in the Town has done something that is not according to the zoning regulations and have [sic] gotten away with it."

Mins. of Nov. 22, 1999 Selectboard Mtg. at 4. (Pl.'s Ex. 36).

At some point in the winter of 1999 or the spring of 2000, Selectboard Members Patrick Eagan, Charles Brown and Elizabeth Shepard attended a meeting of Sand Hill residents concerned about Spectrum. Dec. 5, 2003 Tr. at 63–68, 78–80, 91–107; Shepard Dep. at 108–111 (Pl.'s Ex. 68). Brown told attendees that if they were unhappy with the zoning administrator they should come to the selectboard meeting in the spring and voice their opinions. Dec. 5, 2003 Tr. at 92.

Delbert Beebe testified that Brown invited him to a meeting of citizens concerned about Spectrum at some point during the Spring of 2000. Dec. 3, 2003 Tr. at 176. At the time, Beebe was chairman of the Town of Castleton Planning Commission. According to Beebe, Brown stated that he believed Berlickij had made a mistake in handling the Spectrum affair. *Id.* at 177. Brown denied having this conversation. Dec. 5, 2003 Tr. at 61–62.

It is unclear from the record when, if ever, the Zoning Administrator formally declined to take action against Spectrum. On March 14, 2000, however, Sand Hill residents appealed the Zoning Administrator's decision before the Zoning Board of Adjustment. Agenda & Mins. of March 14, 2000 Zoning Board of Adjustment Mtg. at 1–3 (Pl.'s Ex. 45). The Zoning Board of Adjustment ultimately affirmed the no-action determination. *In re: Appeal of Shuhart, Harris and Blanchard Before the Castleton Zoning Board of Adjustment* at 11 (Pl.'s Ex. 46).

## C. *The Zoning Administrator and Assessor Positions*

When Castleton hired Attorney Carroll to represent the Town on the Spectrum issue in August of 1999, Carroll was also already representing the Town in their negotiations with AFSCME Council 93,

the Town employees' union. Jan. 8, 2004 Tr. at 112, 130. At the August 9, 1999 Selectboard Meeting, the Selectboard entered executive session with Carroll to discuss union matters. Mins. of Aug. 9, 1999 Selectboard Mtg. at 3. The executive session occurred before the Sand Hill residents expressed concerns about Spectrum. *Id.*

Attorney Carroll subsequently drafted a letter to George Lovell, Jr., a representative of AFSCME Council 93. Letter from Carroll to Lovell of Sept. 14, 1999 (Pl.'s Ex. 32). The purpose of the letter was "to clarify the Selectboard's current opinions regarding several positions certified within the Local 1201 bargaining unit." *Id.* at 1. Carroll stated:

> [T]he Selectboard is currently considering a restructuring of some positions within Castleton. Specifically, the Selectboard is considering the reallocation of those responsibilities which are currently assigned to the Assessor/Zoning Administrator and the elimination of the current position. It is expected that the Town Listers may undertake the "assessor's" functions and that the Town Manager may be appointed as Castleton's zoning administrator. It is anticipated that such a change would occur as of April, 2000.

*Id.*

Carroll noted other proposed changes, including the removal of the Mechanic, Transfer Station Operator and Chief Operator of the Wastewater Treatment Plant from the bargaining unit. *Id.* Carroll also stated that the Selectboard intended to seek voter approval to make the Town Clerk's position salaried. Finally, Carroll asserted that the Selectboard expects to discontinue the Assistant Town Clerk's position. *Id.* at 2.

Carroll eventually determined that his work with Berlickij on the Spectrum mat-

ter had progressed to the point that he no longer felt comfortable representing the Town in its union negotiations. *Id.* at 116 The Town subsequently hired Attorneys Eustace and Stitzel to work on the collective bargaining issue. *Id.*

On February 23, 2000, Selectboard Members Eagan and Shepard, as well as Town Manager Davidson, met with Attorneys Stitzel and Eustace. Jan. 8, 2004 Tr. at 82; Dec. 1, 2003 Dep. of Stitzel at 8–9. The group discussed eliminating the Assessor's position and transferring the Assessor's duties to the Listers. Eustace Notes at 1 (Def.'s Ex. JJ). The group also discussed appointing the Town Manager to the Zoning Administrator position. Jan. 8, 2004, Tr. at 104; Eustace Notes at 1–2. In this context, they discussed the Town's collective bargaining agreement. The Selectboard planned to meet with the Planning Commission in early March to address these changes. Jan. 8, 2004, Tr. at 103; Eustace Notes at 1–2. Attorney Stitzel commented that the Selectboard ultimately controlled appointments to the Planning Commission. Jan. 8, 2004, Tr. at 104–05; Eustace Notes at 1–2. No one at the February 23 meeting raised the Spectrum issue.

During early 2000, individual Selectboard members asked Town Manager Davidson whether she would be willing and able to take over the Zoning Administrator position if the consolidation occurred. Jan. 8, 2004 Tr. at 25–26. Davidson told the Selectboard members that she did not know anything about zoning, but was willing to try. *Id.* at 26.

On March 9, 2000, the Castleton Selectboard and Planning Commission held a public meeting. Mins. of Mar. 9, 2000, Selectboard and Planning Commission Mtg. at 1 (Pl.'s Ex. 42). The Selectboard discussed the upcoming appeal of the Zoning Administrator's January 2000 decision declining to take enforcement action against Spectrum's group home on Sand Hill Road. *Id.* at 3. In particular, the Selectboard considered hiring an attorney to represent the Castleton Zoning Board of Adjustment in the appeal. *Id.* In an apparent reference to Attorney Carroll, Selectboard Member Brown stated that the Town had "already paid $1,800 in attorney fees for this matter to try and stop them from coming." *Id.* Selectboard Member Doran disagreed, stating that the Town "didn't spend those funds to stop them from coming but to get the many questions answered." *Id.* The Selectboard hired Attorney John Liccardi to represent the Castleton Zoning Board of Adjustment in the appeal. *Id.*

At a later point in the meeting, the Selectboard voted to enter executive session with the Planning Commission. *Id.* at 6. The minutes do not state the nature of the business to be discussed in executive session. *Id.* The meeting's agenda lists "Personnel" as the subject of a 7:00 pm executive session, however. *Id.* at 1.

There was conflicting testimony about what occurred during the joint executive session. *Compare* Dec. 3, 2003 Tr. at 173–74 *with* Jan. 8, 2004 Tr. at 106–07. Based on all the evidence presented, the Court finds that the Selectboard made the Planning Commission aware that the Board supported the appointment of the Town Manager to the Zoning Administrator position. Dec. 3, 2003 Tr. at 173–74; Dec. 4, 2003 Tr. at 231–32; Dec. 5, 2003 Tr. at 125, 178–79; Jan. 8, 2004 Tr. at 106–07; Shepard Dep. at 46–47. The motive for appointing the Town Manager to the Zoning Administrator position was to downsize the Town government for budgetary purposes. Dec. 5, 2003 Tr. at 30, 130; Jan. 8, 2004 Tr. at 88–90. In this context, the Selectboard and Planning Commission discussed Berlickij's efficiency. They did not discuss any other aspects of her job performance.

Because Berlickij was a member of the union, the Selectboard and Planning Commission discussed the potential ramifications of the appointment on the Town's contract with the union. Dec. 3, 2003 Tr. at 172–73; Dec. 5, 2003 Tr. at 30–31.

On March 14, 2000, Selectboard Chairman Eagan sent a letter to Berlickij stating that "[t]he Selectboard has made a request to the Planning Commission that it appoint Town Manager Beverly Davidson as Zoning Administrator, effective April 1, 2000." Letter from Eagan to Berlickij of March 14, 2000 (Pl.'s Ex. 44). Eagan noted that the Planning Commission "will consider this matter" at a meeting on March 15. *Id.*

The next day, the Planning Commission met to discuss who to recommend for the Zoning Administrator position. Mins. of Mar. 15, 2000 Planning Commission Mtg. at 1–4 (Pl.'s Ex. 47). Berlickij was present and spoke on her own behalf. *Id.* at 2. Members of the public were also given an opportunity to speak. *Id.* at 1–4. The majority of those present favored Berlickij's reappointment. *Id.* at 3. The principal issue discussed was the Zoning Administrator's workload and the potential economic benefits and drawbacks of appointing the Town Manager to the position. *Id.* at 1–4. George Lovell explained that the Zoning Administrator's position was a union position and that the union might contest the appointment of the Town Manager. *Id.* at 2. One individual questioned whether there had been an action taken at the March 9 joint executive session because such an action would be a violation of the Open Meeting Law. *Id.* at 4. No one brought up Spectrum.

Planning Commission Chairman Beebe moved to recommend Berlickij for Zoning Administrator. *Id.* The motion failed for lack of a second. *Id.* Ultimately, the Planning Commission voted to discuss the issue again at a subsequent meeting. *Id.*

On March 17, 2000, Selectboard Chairman Eagan sent a second letter to Berlickij. Letter from Eagan to Berlickij of March 17, 2000 (Pl.'s Ex. 48). Eagan noted the voters' previous approval of a ballot item to recommend the elimination of the Assessor's position. *Id.* He stated that the Selectboard "intends to consider and act upon the voters' recommendation" at the March 27, 2000 meeting. *Id.* Eagan concluded that the position of Assessor will be eliminated effective March 31, 2000 with the Town Listers to assume the duties previously handled by the Assessor. *Id.*

The Planning Commission met again on March 22, 2000. There was extensive public debate about the appointment of a Zoning Administrator. Berlickij again spoke on her own behalf, as did numerous citizens. March 22, 2000 Planning Commission Mtg. at 2–10, (Pl.'s Ex. 50). No one raised the Spectrum issue. George Lovell asserted that failure to appoint Berlickij would be contrary to the collective bargaining unit. *Id.* at 3.

As he did at the previous meeting, Planning Commission Chairman Beebe moved to recommend Berlickij for Zoning Administrator. *Id.* at 9. Again the motion failed for lack of a second. *Id.* Planning Commission member Holly Hitchcock moved to recommend Beverly Davidson. Planning Commission Members Hitchcock, Steen and Marcille voted in favor with Beebe opposed. William Gilbert abstained from voting. *Id.* at 9–10. Beebe resigned from the Planning Commission in protest. *Id.* at 10.

The Selectboard considered the Planning Commission's recommendation at a public meeting the next week. Mins of Mar. 27, 2000 Selectboard Mtg. at 3, (Pl.'s Ex. 53). Berlickij was present, as were a number of supporters who spoke on her behalf. *Id.* at 3–10. After considerable debate, the Selectboard voted to appoint

Beverly Davidson as Zoning Administrator. *Id.* at 10. Selectboard Members Lobdell, Shepard, Doran and Eagan voted in favor, with Brown opposed. *Id.* Selectboard Member Brown stated that he voted against the motion because he did not feel that the Town's attorney had provided adequate representation on the issue. *Id.* At no point during the meeting was the Spectrum issue discussed.

On March 29, 2000, the Selectboard voted to eliminate the Assessor position.

### D. Allegations of Previous Open Meeting Law Violations

Carter Terenzini was the Castleton Town Manager from May, 1994 to October, 1995. Dec. 4, 2003 Tr. at 81. Terenzini testified that during his tenure as Town Manager he observed the Selectboard violate of Vermont's Open Meeting Law. *Id.* at 82. Specifically, Terenzini alleged that a quorum of Board members would meet prior to public meetings and make decisions about Town policy. *Id.* at 83–87. Terenzini also alleged that the Board misused executive sessions to discuss Town employees. *Id.* at 84. In December, 1996, Terenzini sued the Town of Colchester for wrongful termination. *Id.* at 128. The case settled out of court. *Id.* at 92.

C. William Mulholland was Castleton's Town Manager from October, 1995 to February, 1999. *Id.* at 129 He also testified that during his time as Town Manager the Selectboard misused executive sessions to discuss improper matters. *Id.* at 131–33, 139–40.

## II. Conclusions of Law

### A. Open Meeting Law (Count 7)

■ Berlickij alleges that the Town of Castleton violated Vermont's Open Meeting Law, Vt. Stat. Ann. tit. 1, §§ 310–314. Section 312(a) of Vermont's Open Meeting Law requires that "[a]ll meetings of a public body are declared to be open to the

public at all times except as provided in section 313 of this title." Vt. Stat. Ann. tit. 1, § 312(a). Berlickij avers that the Town held "un-warned meetings at which actual Select Board policy was adopted and Planning Commission consensus was reached." According to Berlickij, the Selectboard decided to eliminate the Assessor position and appoint the Town Manager to the Zoning Administrator position during secret meetings.

#### 1. Zoning Administrator Position

The Selectboard began to consider appointing the Town Manager to the Zoning Administrator position some time before September 1999, when Attorney Carroll wrote to George Lovell to advise him of the possibility. On March 9, 2000, the Selectboard made the Planning Commission aware that the Board supported the Town Manager for the position.

Berlickij points out that Selectboard members individually approached the Town Manager to discuss the appointment prior to the March 9, 2000 joint executive session. Berlickij also cites the February 23, 2000 meeting at which Selectboard Members Eagan and Shepard and Town Manager Davidson discussed combining the Town Manager and Zoning Administrator positions with Attorneys Stitzel and Eustace. According to Berlickij, this evidence demonstrates that the Selectboard made its decision at some point before the March 9, 2000 joint executive session. Berlickij further reasons that because the Selectboard did not discuss the Zoning Administrator position in a public forum between September 1999 and March 2000, the Selectboard must have discussed and decided the issue during secret meetings.

Individual Selectboard members may well have reached a decision about the appointment before the March 9, 2000 meeting. Yet there are numerous ways

this could have occurred that do not involve clandestine Selectboard meetings. Board members could have discussed the matter with their constituents, to cite just one example. The Court recognizes that proving secret meetings is a difficult task, one that will frequently require inferential leaps. Nevertheless, the facts in this case are insufficient to support an inference that the Selectboard held secret meetings about the Zoning Administrator appointment.

### 2. *Assessor Position*

It is undisputed that Castleton citizens voted to recommend the Assessor's position be eliminated. It is equally undisputed that the Selectboard publicly voted to act upon the recommendation. Nevertheless, Berlickij insists that the Selectboard made the decision in secret.

Berlickij relies on Chairman Eagan's letter to Berlickij notifying her that the Board "intends to consider and act the voters' recommendation" and then states that the position "will be eliminated effective March 31, 2000." Letter from Eagan to Berlickij of March 17, 2000 (Pl.'s Ex. 48). From this, Berlickij concludes that Eagan already knew that the Selectboard was going to vote to eliminate the Assessor position because the Selectboard had met in secret.

This evidence does not support the weight Berlickij places on it. Eagan's letter could indicate that Eagan knew how the Board would vote, but it could just as easily suggest that Eagan merely thought he knew how the Board would vote. Simply put, Berlickij has failed to prove that the Selectboard met in secret to discuss the Assessor position or any other matter.

### 3. *Improper Executive Session*

Berlickij also alleges that the Town of Castleton violated section 313(a) of Vermont's Open Meeting Law by holding an improper executive session on March 9, 2000. Section 313(a) prohibits public bodies from holding an executive session except to consider one or more statutorily defined subjects. Vt. Stat. Ann. tit. 1, § 313(a)(1)-(8). Courts must interpret these exemptions strictly. *Trombley v. Bellows Falls Union High School District No. 27*, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993).

The section 313(a)(1) exemption permits a public body to consider "labor relations agreements with employees ... where premature general public knowledge would clearly place [the Town] at a substantial disadvantage." Vt. Stat. Ann. tit. 1, § 313(a)(1). During the March 9 joint executive session, the Selectboard made the Planning Commission aware that the Board supported Beverly Davidson, the Town Manager, for the position of Zoning Administrator. In this context, the Town's collective bargaining agreement was discussed. Nevertheless, there has been no showing that public knowledge of this issue would have put the Town at any disadvantage whatsoever. In fact, the Selectboard and Planning Commission both had public meetings on the issue shortly thereafter. Accordingly, the executive session was not permissible under section 313(a)(1).

The section 313(a)(3) exemption permits consideration of "[t]he appointment or employment or evaluation of a public officer or employee." Vt. Stat. Ann. tit. 1, § 313(a)(3). Although the Selectboard and Planning Commission discussed the appointment of a Zoning Administrator during the March 9 executive session, the principal issue was the budgetary effect of having one individual serve as both Town Manager and Zoning Administrator. This type of policy consideration is not permitted under section 313(a)(3).

No other exemptions are applicable. The Court therefore holds that the Town violated section 313(a) by considering matters inappropriate for executive session.

■ The Town committed a second Open Meeting Law violation on March 9, 2000 as well. Section 313(a) prohibits a public body from taking "formal or binding action" while in executive session.[3] Vt. Stat. Ann. tit 1, § 313(a). By expressing support for appointing the Town Manager as Zoning Administrator in executive session, the Selectboard was, in effect, articulating support for a specific policy: the combination of the Town Manager and Zoning Administrator positions. Moreover, the Board attempted to influence the Planning Commission's recommendation, thus taking an affirmative step toward achieving that policy objective. Taking action in furtherance of a given policy is a "formal" action as contemplated by section 313(a).

■ Section 314(b) permits "any person aggrieved" by a violation of the Open Meeting Law to seek "appropriate injunctive relief" or "declaratory judgment". Vt. Stat. Ann. tit. 1, § 314(b). As a the violations described above, Berlickij is entitled to declaratory relief. However, the Court need not order injunctive relief. As discussed below, there has been no showing of continuing Open Meeting Law violations. Berlickij is no longer employed by the Town and would not suffer damages unique to her if the Town violated the Open Meeting Law. Finally, injunctive relief would merely order that the Town comply with the law and the Court presumes the Town will comply with that obligation with or without a court order. The Court therefore declines to order injunctive relief.

### B. First Amendment (Count 1)

■ Berlickij claims the Selectboard violated her First Amendment rights of association, to petition for redress of grievances and to free speech by holding secret meetings at which the Board discussed and voted upon the appointment of a Zoning Administrator and the elimination of the Assessor position. She further contends the Town violated these rights at the March 9, 2000 joint executive session.

As discussed above, Berlickij has not proven that the Selectboard held any secret meetings. Thus, to the extent that her First Amendment claim relies on a finding that secret meetings occurred, the claim fails.

Berlickij has established that the Board violated section 313 of Vermont's Open Meeting Law on March 9, 2000. Nevertheless, " § 1983 does not create a remedy for the violation of purely state-created rights, as its manifest purpose is to 'create a species of liability in favor of persons deprived of their federal civil rights by those wielding state authority.' " *Rowe v. Brown*, 157 Vt. 373, 376, 599 A.2d 333, 335 (1991) (quoting *Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)). Therefore, the question is whether the Town also violated Berlickij's First Amendment rights on March 9, 2000.

Berlickij has a First Amendment right not be excluded from a forum that is generally held open to the public. *Rowe*, 157 Vt. at 376, 599 A.2d at 335 (1991) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); *see also Pickering v. Bd. of Educ. Of Township High Sch. Dist. 295*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (public em-

---

**3.** Except for certain actions "relating to the securing of real estate options." Vt. Stat. Ann. tit. 1, § 313(a).

ployee does not relinquish citizen's First Amendment rights). It is undisputed that the meeting in question was a designated executive session. Executive sessions are not fora generally held open to the public. Vt. Stat. Ann. tit. 1, § 313; *Rowe* 157 Vt. at 376, 599 A.2d at 335. The fact that the Selectboard violated the Open Meeting Law while in executive session did not convert the executive session into a public forum. *See Rowe*, 157 Vt. at 376, 599 A.2d at 335. As a result, Berlickij had no First Amendment right to attend the March 9, 2000 executive session.

Moreover, a town "can be held liable [under § 1983] only if the alleged unconstitutional action implements an official 'policy or custom [of the municipality], whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Morris v. Lindau,* 196 F.3d 102, 111 (2d Cir.1999) (quoting *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Although both Terenzini and Mulholland testified that they observed the Castleton Selectboard violating Vermont's Open Meeting law, there is insufficient evidence for the Court to conclude that any specific violations occurred. Therefore, even if the Selectboard's Open Meeting violations on March 9, 2000 did rise to the level of a First Amendment violation, Berlickij has failed to established that Castleton has a policy or custom of unconstitutional conduct.

■ For these reasons, the Court holds that the Town is not liable to Berlickij for violating her First Amendment rights of association, to petition for redress of grievances, and to free speech.

## C. *Retaliation for Protected Speech (Counts 3 & 4)*

■ Berlickij contends that her communications in support of Spectrum were protected under the First Amendment of the United States Constitution and Article 13 of the Vermont Constitution.[4]

Berlickij must "initially demonstrate by a preponderance of the evidence that: (1)[her] speech was constitutionally protected, (2)[she] suffered an adverse employment decision, and (3) a causal connection exists between [her] speech and the adverse employment determination against [her] so that it can be said that [her] speech was a motivating factor in the determination." *Morris*, 196 F.3d at 110 (citing *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Evidence of causation "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Id.*

■ Assuming for the moment that Berlickij has met her burden of proof on the first two factors, she has not proven that her termination as a Town employee was causally related to any action she took in connection with Spectrum. Although a group of Sand Hill residents opposed what they perceived to be Spectrum's intrusion into their neighborhood, there is scant evi-

---

4. The Vermont Supreme Court has indicated that Article 13 of the Vermont Constitution is coextensive with the First Amendment of the United States Constitution. *See Shields v. Gerhart*, 163 Vt. 219, 226–27, 658 A.2d 924, 929 (1995). For state law claims of retaliation against employees for engaging in pro-

tected activities, the Vermont Supreme Court has held it would follow the analytical approach adopted by the United States Supreme Court. *See In re McCort*, 162 Vt. 481, 490, 650 A.2d 504, 509 (1994). Accordingly, the Court will treat Berlickij's First Amendment and Article 13 claims together.

dence that anyone blamed Berlickij. Nor was Berlickij a particularly outspoken Spectrum advocate. In fact, rather than indicate support for Spectrum, her public comments merely express Berlickij's understanding that the Town could not legally prevent Spectrum from using the Sand Hill property as a group home. Attorney Carroll, who worked closely with Berlickij on the Spectrum matter and who has no apparent motive to mislead, testified that like other Castleton citizens, Berlickij was unhappy that Spectrum moved to town without applying for a zoning permit.

There is even reason to doubt whether Berlickij herself understood there to be a connection between Spectrum and her termination. It is telling that in March of 2000, Berlickij and her supporters never raised the Spectrum issue when they lobbied on Berlickij's behalf during the Planning Commission and Selectboard meetings.

Furthermore, almost without exception, the witnesses in this case credibly testified that the Selectboard appointed the Town Manager to the Zoning Administrator position and eliminated the Assessor position in order to save the Town money. The public meetings of the Selectboard and Planning Commission focused on the Zoning Administrator's workload and the economic benefits of consolidating the position with that of the Town Manager. In order to demonstrate that this economic explanation is mere pretext, Berlickij relies heavily on the temporal proximity between the Spectrum matter and the Board's decisions. To be sure, under certain circumstances retaliation can be established by showing temporal proximity between the protected conduct and the adverse action. E.g., Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988). But the chronology of events does not entirely support Berlickij's argument. The citizens of Castleton voted to recommend eliminating the Assessor position before the emergence of the Spectrum controversy, for example. In any event, without more, the temporal proximity between the Spectrum controversy and Berlickij's termination does not prove causation.

Berlickij also points out that she was never considered for the newly combined position of Town Manager and Zoning Administrator despite her allegedly superior qualifications. This argument ignores the fact that it was the Zoning Administrator, not the Town Manager, whose three-year term was approaching completion. The Selectboard did not create a new position and then seek to fill it; the Board appointed the Town Manager to the available Zoning Administrator position. As the March 2000 public meetings of both the Planning Commission and the Selectboard amply demonstrate, Berlickij was considered for the Zoning Administrator position.

Having carefully reviewed all the evidence and the parties' arguments, the Court holds that Berlickij has failed to prove that Spectrum was even a consideration, let alone a motivating factor, in the Selectboard's appointment of a Zoning Administrator and elimination of the Assessor position. In light of this holding, the Court need not determine whether Berlickij's conduct was protected or whether she suffered an adverse employment action.

D. *Remaining Retaliation Claims (Counts 5 & 6)*

█ Berlickij alleges that she was retaliated against in violation of the Fair Housing Act ("FHA"), 42 U.S.C.A. §§ 3601–3631 and Vermont's Public Accommodation Law, Vt. Stat. Ann. tit. 9, §§ 4500–4507. Under the FHA, it is unlawful "to coerce, intimidate, threaten, or interfere with any

person ... on account of [her] having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [listed sections] of this title." 42 U.S.C.A. 3617. The Court applies the burden-shifting rules articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to Berlickij's retaliation claim under the FHA. *See Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 54 (2d Cir.2002) (applying the *McDonnell Douglas* burden-shifting rules to a FHA retaliation claim).

Berlickij must first establish a prima facie case of retaliation. *Id.* (citation omitted). She must establish: (1) that she was engaged in protected activity; (2) that the Town was aware of this activity; (3) that the Town took adverse action against her; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Id.* (citation and quotation omitted).

Section 4503 of Vermont's Public Accommodations Law prohibits "represent[ing] to any person because of the ... handicap of a person ... that any dwelling is not available ... for sale." Vt. Stat. Ann. tit. 9, § 4503(a)(4). Section 4503 also makes it unlawful to "coerce intimidate, threaten or interfere with any person in the exercise or enjoyment of any right granted or protected by this chapter." *Id.* at § 4503(a)(5).

Both Berlickij's Fair Housing Act and Public Accommodations Law claims require a causal link between the Spectrum issue and her loss of employment. Because Berlickij has failed to prove such a link, her claims cannot survive.

## III. *Conclusion*

For the reasons set forth above, the Court finds for the Defendant, Town of Castleton, on Counts 1, 3, 4, 5 and 6. Plaintiff, Patricia Berlickij, has proven by a preponderance of the evidence that the Town violated Vermont's Open Meeting Law, Vt. Stat. Ann. tit. 1, § 313, on March 9, 2000. Berlickij is therefore awarded declaratory judgment on Count 7.